IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

APRIL 1997 SESSION

FILED

September 30, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 01C01-9606-CR-00275 |
| Appellee, | * | DAVIDSON COUNTY |
| VS. | * | Hon. Fred A. Kelly, III, Judge |
| DOUGLAS RUSSELL DELOIT, | * | (DUI) |
| Appellant. | * | |

For Appellant:                      For Appellee:

C. Edward Fowlkes                Charles W. Burson
Fowkles & Whiteside             Attorney General & Reporter
172 Second Avenue, North
Suite 214                             Lisa A. Naylor
Nashville, TN  37201            Assistant Attorney General
                                          450 James Robertson Parkway
                                          Nashville, TN  37243-0493

                                          George R. Bonds
                                          Assistant District Attorney General
                                          Washington Square, Suite 500
                                          Nashville, TN  37201-1649

OPINION FILED:_____

REVERSED AND REMANDED

GARY R. WADE, JUDGE

## OPINION

The defendant, Douglas Russell Deloit, was convicted of driving under the influence. The trial court imposed a jail sentence of eleven months and twenty-nine days, suspended all but forty-eight hours, and barred the defendant from driving for one year. In this appeal of right, the defendant challenges the admission into evidence of breath test results and argues that the evidence is otherwise insufficient to sustain the conviction. We agree that the trial court erred by admitting the test results. The judgment is, therefore, reversed and the cause remanded for a new trial.

Officer Wallace Taylor testified that he worked for the Davidson County Metropolitan Police Department on the DUI Task Force. In the early morning hours of February 24, 1995, Officer Taylor observed the defendant's vehicle "roll through a stop sign." When the officer then stopped the defendant and asked for his driver's license, he noticed "a very strong odor of alcohol" and observed that "[h]is eyes were watery and his speech was slurred." Officer Taylor conducted field sobriety tests, concluded the defendant was intoxicated, and made the arrest. The defendant, who admitted that he had consumed five "Sam Adams" beers that night, registered a .17 on the breath alcohol test.

James E. Jones, who had been a friend to the defendant for several years, testified he had had chips and a beer with the defendant at about 6:00 or 7:00 p.m. the night before his arrest. He stated that the defendant appeared to be sober. Another friend, Patty Swint, testified that she met the defendant around 11:30 p.m. at a restaurant. She recalled that they shared a pizza and the defendant consumed two beers. She claimed that when she left the restaurant at around 12:45 a.m., only a short while before the arrest, the defendant appeared "totally normal."

2

The defendant testified that he had met Jones to discuss a business opportunity. He insisted that he had one beer while he was waiting for Jones and had only one more during their business conversation. After the meeting, the defendant returned to his home before an arranged meeting with Ms. Swint to discuss his marital problems. The defendant recalled that he arrived at the restaurant first, had a beer while he waited, and then had a second beer with his meal. Stopped by Officer Taylor on his way home from the restaurant, the defendant admitted that he made a "rolling stop" through an intersection. He remembered telling the officer that "over the course of about five hours [he] had about four [beers]." The defendant claimed that he performed well on the field sobriety tests and was surprised when the officer asked him to do a breath test.

### Issues

The defendant argues the trial court erred by allowing the breath test evidence on three separate grounds:

(I) Officer Taylor was not qualified to administer and testify regarding the breath test;

(II) the testing device was not regularly calibrated; and

(III) the officer did not observe the defendant for the requisite twenty minutes prior to testing.

We will address each of the three issues in the order they were presented.

### I

The first argument is that the testing officer was not qualified to testify about the results. In order to assess the merits of this contention, a review of the progression of the law is in order. Traditionally, the testifying officer has been

required to "interpret the test results in evidence" as a prerequisite to admissibility.

Pruitt v. State, 393 S.W.2d 747, 751 (Tenn. 1965).  The state was required to "show

that the measuring device [was] scientifically acceptable and accurate ... and that

the witness who presents the test results is qualified to interpret them."  Id.  In Pruitt,

our supreme court ruled that a contrary holding "would be to approve pure hearsay

evidence of intoxication."  Id. at 752.  See also State v. Johnson, 717 S.W.2d 298

(Tenn. Crim. App. 1986).

In 1985, our statutory scheme was amended to establish a statewide

procedure for administering breath tests in such a manner as to ensure reliability

and accuracy:

> (d) (2)  Upon approval of the director of the Tennessee
> bureau of investigation, local governing bodies which
> have the responsibility for providing funding for sheriffs'
> offices and police departments, are authorized to
> purchase from state contracts approved for bureau
> purchases, scientific instruments designed to examine a
> person's breath and measure the alcohol content thereof,
> for use as evidence in the trial of cases; provided, that
> prior to use thereof, such instruments must be delivered
> to the forensic services division of the bureau for testing
> and certification pursuant to subsection (g).  The bureau
> shall continue to maintain and certify the instruments and
> operating personnel, pursuant to subsection (g), and
> furnish expert testimony in support of the use of such
> instruments when required.
>
> ***
>
> (g)  The bureau, through its forensic services division,
> shall establish, authorize, approve and certify techniques,
> methods, procedures and instruments for the scientific
> examination and analysis of evidence, including blood,
> urine, breath or other bodily substances, and teach and
> certify qualifying personnel in the operation of such
> instruments to meet the requirements of the law for the
> admissibility of evidence.  When examinations, tests and
> analyses have been performed in compliance with such
> standards and procedures, the results shall be prima
> facie admissible into evidence in any judicial or quasi-
> judicial proceeding, subject to the rules of evidence as
> administered by the courts.

Tenn. Code Ann. § 38-6-103 (d)(2), (g) (emphasis added) (1985 Tenn. Pub. Act 124, §§ 1, 3).

Thereafter, our supreme court established the general foundational requirements for the admissibility of breath tests. State v. Sensing, 843 S.W.2d 412 (Tenn. 1992). In Sensing, the court ruled that the testing officer must be able to testify to the following:

> (1) that the tests were performed in accordance with the standards and operating procedure promulgated by the forensic services division of the Tennessee Bureau of Investigation;
>
> (2) that [the testing officer] was properly certified in accordance with those standards;
>
> (3) that the evidentiary breath testing instrument used was certified by the forensic services division, was tested regularly for accuracy and was working properly when the breath test was performed;
>
> (4) that the motorist was observed for the requisite 20 minutes prior to the test, and during this period, he did not have foreign matter in his mouth, did not consume any alcoholic beverage, smoke, or regurgitate;
>
> (5) evidence that [the testing officer] followed the prescribed operational procedure; and
>
> (6) [that the testing officer] identify the printout record offered in evidence as the result of the test given to the person tested.

Id. at 416. In 1995, our supreme court described Sensing as establishing the "prerequisites for threshold admissibility" of breath alcohol test results. State v. Bobo, 909 S.W.2d 788, 790 (Tenn. 1995). A question left unanswered in the Sensing opinion was whether this same standard would apply to counties which did not utilize the program governed by Tenn. Code Ann. § 38-6-103. The Intoximeter 3000, "the testing device in general use in the State of Tennessee" was at issue in Sensing. 843 S.W.2d at 415. The court observed that at that time neither Davidson nor Shelby Counties used the Intoximeter 3000. 843 S.W.2d at 414, n. 1.

5

The defendant argues that if <u>Sensing</u> does not apply, then the state must proceed under <u>Pruitt</u> and the officer must be qualified as an expert who understands the technical workings of the machine. The defendant insists the state has failed to lay an adequate foundation under the rulings of either <u>Sensing</u> or <u>Pruitt</u>. The state contends that <u>Sensing</u> does not apply in counties that do not use the statutory program.

At least two unpublished opinions of our court have suggested that the <u>Sensing</u> requirements do not apply if the county does not participate in the statutory program. In <u>State v. Barbara Gallegos</u>, No. 02C01-9305-CR-00084 (Tenn. Crim. App., at Jackson, May 25, 1994), the defendant was tested in Shelby County on the Alcomat breathalyzer. She argued that the "trial court erred in failing to require the state to produce a certification that the Alcomat testing device ... had been approved ... by an independent forensic agency and had been periodically inspected for accuracy by that agency." <u>Id.</u>, slip op. at 2. This court affirmed the conviction holding that "Tenn. Code Ann. § 38-6-103 (1991) has no application to testing equipment utilized in Shelby and Davidson Counties," observing that "[b]oth counties operate a program independent of the procedure provided by the Forensic Services Division of the Tennessee Bureau of Investigation." <u>Id.</u>, slip op. at 4-5. In <u>State v. Jeffery H. Rivers</u>, No. 02C01-9203-CR-00070 (Tenn. Crim. App., at Jackson, July 14, 1993), the defendant argued the breath test should not have been administered because the officer failed to observe him for the required period of time. The court ruled that the "six [<u>Sensing</u>] prerequisites for admission of the test results are crafted for use in cases where the county participates in the device certification program administered by the Tennessee Bureau of Investigation and the testing device is an <u>Intoximeter 3000</u>." <u>Id.</u>, slip op. at 4.

Neither <u>Gallegos</u> nor <u>Rivers</u> address what type of foundation should be

6

established if <u>Sensing</u> does not apply. Given the fact that the breath test results may result in the "presumption that the defendant was under the influence," Tenn. Code Ann. § 55-10-408(b), an evidentiary foundation must be required in order to assure reliability. We conclude that if the state does not proceed under <u>Sensing</u>, the state must proceed under the Tennessee Rules of Evidence and a foundation which ensures reliability of the test results must first be established before the evidence is permitted.

This approach has been adopted by at least one other jurisdiction; in <u>State v. Brooks</u>, 643 A.2d 226 (Vt. 1993), the Vermont Supreme Court considered a statute which required its department of health to promulgate rules on how to conduct breath tests. <u>Id.</u> at 227. The statute provided that "analysis performed by the state shall be considered valid when performed according to a method or methods selected by the department of health." <u>Id.</u> (quoting 23 V.S.A. § 1203 (d)). In <u>Brooks</u>, the defendant established that the department had not complied with the statute's rule-making requirements. <u>Id.</u> The state argued that the results should nevertheless be allowed if "scientific reliability of the [test in general] and the trustworthiness of the defendant's test result in particular" had been established. <u>Id.</u> at 228. The Vermont Supreme Court ruled as follows:

> Compliance with the statutory rule-making requirement is mandatory only to the extent that the State wishes to benefit from the presumption of validity. The statute does not state or imply that department rule-making is a prerequisite to admissibility .... Without a statutory basis for excluding the [test], the rules of evidence determine whether [the results] are admissible.
> DUI test results may be proved by traditional evidentiary means.

<u>Id.</u> at 228.

Our view is that if the state complies with the requirements of <u>Sensing</u>, it is entitled to the presumption that the test results are reliable and the results may

7

be admitted into evidence without the benefit of an expert. If not, the state may still use traditional rules of evidence to lay the foundation for admitting the evidence but there is no presumption of reliability. See Tenn. R. Evid. 702, 703.

In State v. Bobo, 909 S.W.2d 788 (Tenn. 1995), a case in which the state conceded the prescribed operational procedure had not been followed, our supreme court included language which implies that the Sensing requirements must be met every time the state attempts to admit breath test results. Id. at 789. The state offered a forensic scientist who determined the sample was sufficient for a "valid test." Id. The forensic scientist believed that the test was valid and the deviation would have actually benefitted the defendant by giving a lower reading. Id. The state contended that because the deviation benefitted the defendant, the test results should have been admitted. Our supreme court disagreed:

> Sensing established the prerequisites for threshold admissibility of breath alcohol test results. While it relaxed Pruitt's more strenuous admissibility requirements, it did not remove all requirements for threshold admissibility. The prerequisites to admissibility in Sensing are just that: prerequisites to admissibility. They are not factors for determining the weight of the evidence.

Bobo, 909 S.W.2d at 790. In Bobo, the court also refers to Sensing as the "unambiguous threshold admissibility requirements." Id. at 789. This language, if given a broad interpretation, might mean that Sensing is the exclusive means of admitting breath test results. We do not believe that our supreme court intended such a sweeping construction.

In Bobo, our high court ruled as admissible "test results offered through the testimony of the testing officer." Bobo, 909 S.W.2d at 789 (emphasis added). Our inference is that the holding should be limited in circumstances in which the state, through Tenn. Code Ann. § 38-6-103(g), seeks to admit the test

8

results through the testimony of the non-expert testing officer. <u>See</u> Tenn. Code Ann. § 38-6-103(g) (when tests have been performed in compliance with the statute, the results are "prima facie admissible").

The ruling in <u>Bobo</u> provides that once the state decides to proceed under <u>Sensing</u>, which relaxed traditional requirements of admissibility, there can be no further relaxation of the rules. The supreme court held that "[w]hile it [<u>Sensing</u>] relaxed <u>Pruitt's</u> more strenuous admissibility requirements, it did not remove all requirements for threshold admissibility." <u>Bobo</u>, 909 S.W.2d at 790. In <u>Bobo</u>, the state admitted to non-compliance with <u>Sensing</u> but asked the court to ignore this because the state offered evidence that the non-compliance benefitted the defendant. Our supreme court "decline[d] the state's invitation to eliminate as an admissibility requirement that the testing operator follow the prescribed operational procedure." <u>Id.</u>

So limited, the ruling in <u>Bobo</u> would not prevent the state from establishing the more stringent foundation for admission of test results as set out in Tenn. R. Evid. 702 and 703:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Rule 703 provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

9

Tenn. R. Evid. 703. Under Rule 702, expert testimony may be used to present scientific or technical information if the evidence will "substantially assist the trier of fact." Establishing the reliability of the information is a key in determining whether the trier of fact will be assisted by the evidence. See State v. Harris, 866 S.W.2d 583, 587 (Tenn. Crim. App. 1992). Reliability may, in turn, depend upon the existence of a "consensus" of opinion in the relevant scientific community. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). Rule 703 imposes the requirement that the underlying facts or data be trustworthy. All evidence must be relevant. Tenn. R. Evid. 403. These general requirements for the admission of scientific or technical evidence fairly and adequately embrace the concerns expressed in Pruitt that breath test results be "scientifically acceptable and accurate for the purpose for which it is used, and that the witness who presents the test results is qualified to interpret them." Pruitt, 393 S.W.2d at 751.

Having determined the state has the alternative of proceeding under either the Sensing requirements or the more onerous conditions described in the Tennessee Rules of Evidence, this court nonetheless holds that in this case the test results should not have been allowed into proof. Officer Taylor testified that he had examined the defendant with the Patton 1400 machine. He had received training on the machine in Owensboro, Kentucky at the CMI Plant but had not received any training certification from the Tennessee Bureau of Investigation. He did not believe the machine had ever been tested or certified by the T.B.I. The officer did not know when the machine had last been calibrated, saying only that "whenever the instrument breaks down, we take it up to Owensboro. And before it's sent back it's calibrated then." The officer acknowledged that "all of the checking of the internal workings of the machine are done in Owensboro." Officer Taylor had no idea when the machine was last sent back to Owensboro.

10

Obviously, this testimony does not meet the prerequisites for admission established in Sensing. Officer Taylor acknowledged that he had not been trained by the T.B.I. and that the machines had not been certified or calibrated by T.B.I. There was simply no proof that the state had followed the "standards and operating procedure promulgated by the forensic services division of the [T.B.I.]." Sensing, 843 S.W.2d at 416. Requirements (1), (2), and (3) under Sensing were not met. At trial and on appeal, the state made no effort to proceed under the more rigorous provision found in the Tennessee Rules of Evidence. Because there was an inadequate foundation, the trial court committed error by admitting the test results.

II

The defendant's second challenge to the admission of the breath test is that the machine was not regularly calibrated. At the hearing on the motion in limine, the officer testified that the machine was not calibrated until it "breaks down." The machine was then sent to Owensboro, Kentucky, for calibration and repair. Officer Taylor did not know when the machine was last calibrated, yet insisted that "if there's anything wrong with the instrument itself, it will not allow you to give a person a test. ... It [the machine] just aborts the test."

Based upon this, the trial court ruled that evidence of calibration was not necessary because the machine shuts down automatically when not functioning properly. Standing alone, that would not have been enough. Before the test results were admitted at trial, however, Officer Taylor testified that a simulated test, referred to as a "wet bath test," is done on the machine each day. He referred to this as a routine, "simulated test." The purpose was "to make sure that it is working properly." Thus, in our view, the trial testimony met the "tested regularly" portion of Sensing standard three. A "wet bath test" each day in order to ensure the machine

11

is functioning properly qualifies the machine as having been "tested regularly for accuracy." See Sensing, 843 S.W.2d at 416.

III

The defendant's third complaint is that Officer Taylor did not comply with the twenty minute observation requirement. The fourth Sensing requirement is that "the motorist was observed for the requisite 20 minutes prior to the test, and during the period, he did not have foreign matter in his mouth, did not consume any alcoholic beverage, smoke, or regurgitate." Sensing, 843 S.W.2d at 416.

Defense counsel asked how the officer met the twenty-minute waiting period requirement:

> I take the time--from the time I have contact with him,
> that's the time of the stop, time to get him out of the car,
> time that he takes to take the field sobriety test, the time
> that I put him back into the car. And, generally, I'm down
> to the part of the report where it's time to take the breath
> test. That is the period of 20 minutes.

The officer estimated that it took the defendant fifteen minutes to take the field sobriety tests. He believed the defendant was in the police car for "10 to 13 more minutes." As he was filling out paperwork, Officer Taylor "had [his] rearview mirror facing [the defendant]." Officer Taylor insisted, "I could see him back there, and we were talking then. So, if you're asking me if I lost contact of him, no." Defense counsel asked, "Is it fair to say then that your eyes could not have been on [the defendant] the whole time because part of the time you were looking down at the paper? And part of the time you'd glance up and look in the mirror?" The officer responded, "Yes, sir." When trial counsel asked whether any of the field sobriety tests required the defendant to walk away from the officer, the trial court interrupted the examination:

> I believe I've heard enough now. We're getting just a
> little bit [too] technical, maybe a little picky. I find that the

12

purpose of 20 minutes [has] been fulfilled. It doesn't mean that it has to be eyeball to eyeball as long as the subject is within observation. And the purpose of that, of course, had been enumerated in your opinion here. It doesn't say that an observation cannot be in a mirror, cannot be even from behind if he knows nothing is being placed in the mouth or regurgitated there from. So the complete purpose of this 20-minute wait has been fulfilled. And I find no problem so far with the testimony.

In State v. McCaslin, 894 S.W.2d 310 (Tenn. Crim. App. 1994), the testing officer was unable to testify that he had watched the defendant for the requisite twenty minutes; in consequence, the test results were found inadmissible. McCaslin had been placed in the patrol car at 2:20 a.m., arrived at the police station at 2:30 a.m., and was administered the test at 2:46 a.m. Id. at 311. The "undisputed period of observation" was sixteen minutes. Id. Our court held that the time the defendant was in the patrol car could not be considered because the officer could not "say with certainty that the defendant did not regurgitate while out of his view in the backseat of the patrol car from 2:20 a.m. until they arrived at the station." Id. at 311-12.

In McCaslin, the state had argued that the test results should nevertheless have been admitted because the defendant did not present any evidence that he had in fact regurgitated. This court responded to that argument as follows:

[T]he State's position is misplaced as it is the State's burden, not the defendant's, to present testimony through the testing officer that the Sensing pre-test requirements were met. Therefore, a claim that the defendant either presented or failed to present testimony of regurgitation is irrelevant in this case.

Id. at 312.

Another case where our court addressed the twenty-minute observation requirement is State v. Harold E. Fields, No. 01C01-9412-CC-00438,

13

slip op. at 4 (Tenn. Crim. App., at Nashville, Apr. 12, 1996). In Fields, the testing officer remained in the same room with the defendant during the twenty-minute period. The deputy acknowledged that he did not "maintain a continuous watch ... during those twenty minutes." Id., slip op. at 2. "Although in the same room with the [defendant], the deputy filled out paper work and entered data on a keyboard into the Intoximeter 3000 during the observation period." Id. The deputy testified that "although he did not turn his back to the [defendant] during the observation period, he also did not keep his eyes trained on the [defendant] during the entire period." Id., slip op. at 5. In Fields, the trial court had found the twenty minute rule had not been satisfied; the state appealed to our court and we affirmed the ruling of the trial court; a panel of this court ruled that "[w]here an officer can testify that he or she continuously observed the test subject, with his or her eyes, for the entire twenty-minute observational period, the State will ... be able to meet this requirement ...." Id., slip op. at 5. The court held, "[t]hat an officer remained in the room with the defendant for twenty minutes prior to testing will not satisfy the requirements of Sensing. Sensing requires the State to establish that during those twenty minutes nothing occurred which would compromise the validity of the breath alcohol test." Id.

The state must establish compliance with Sensing by a preponderance of the evidence. State v. Jerry Wayne Edison, No. 03C01-9605-CC-00199, slip op. at 8 (Tenn. Crim. App., at Knoxville, June 18, 1997), perm. to appeal filed, Aug. 18, 1997. Our court's review of the trial court's ruling is whether the trial court abused its discretion. Id., slip op. at 10. Even with this limited scope of review, we must determine the trial court erred by concluding the Sensing twenty-minute requirement had been satisfied. The officer testified that he had the defendant under observation while he administered the three field sobriety tests for about fifteen minutes. Then the officer testified that he placed the defendant in the backseat of

the patrol car and observed the defendant through the rearview mirror while he filled out paperwork. The officer conceded that he could not observe the defendant while writing on the arrest report. The Fields opinion requires that the officer "continuously observe[] the test subject, with his or her eyes, for the entire twenty-minute observational period." Fields, slip op. at 5.

## CONCLUSION

We must now determine whether the erroneous admission of the breath test was harmless error. Here, the officer testified he saw the defendant do a "rolling stop" at a stop sign. Then, the defendant performed poorly on two field tests. The defendant admitted to the police officer that he had consumed "five Samuel Adams" over a period of hours and the officer detected the odor of alcohol. This evidence is to be weighed against the defendant's testimony that he thought he performed well on the field sobriety tests and that he was surprised when the officer asked him to take a breath test. Also, the defendant presented the testimony of two different friends who stated the defendant appeared sober at various points and acted normally before the arrest. Yet, the defendant admitted at trial that he had consumed four beers over the course of several hours during the evening.

In McCaslin, our court ruled that the erroneous admission of the breath test was reversible error:

> As in any case it is impossible to determine the weight, if any, given by a jury to any item of evidence. However, when the only scientific evidence presented at trial was admitted in error we cannot say that the effect was harmless.

McCaslin, 894 S.W.2d at 312. In McCaslin, the remaining evidence, besides the breath test, was that the arresting officer observed the defendant's car weaving on the road, that the defendant was unsteady and smelled of alcohol, and video recordings of the defendant performing field sobriety tests. Id. at 311-12. The

15

videos were "inconclusive[]" in establishing the defendant's guilt.  Id. at 312.  Thus, the court concluded admission of the test results was reversible error.  Id.

The evidence here is comparable to that presented in McCaslin. Because the proof, other than the breath tests results, was fairly balanced, we must conclude that a jury should determine the question.

Finally, the defendant has argued that without the breath test, the evidence is altogether insufficient to sustain a conviction.  We disagree.  Our code provides "[i]t is unlawful for any person ... to drive ... any automobile ... while under the influence of any intoxicant ...."  Tenn. Code Ann. § 55-10-401.  Even without the breath test, there is persuasive evidence that the defendant drove his vehicle in a manner impaired by his use of alcohol.  An acquittal by this court under those circumstances would not be warranted.

Accordingly, the judgment of conviction is reversed and remanded for a new trial.

_____
Gary R. Wade, Judge

CONCUR:


_____
David H. Welles, Judge


_____
Curwood Witt, Judge